1998 OK CIV APP 118

**In the Matter of M.K. and L.K., alleged deprived children.**

**Robert KNIGHT, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

No. 90,773.

Court of Civil Appeals of Oklahoma, Division No. 3.

June 30, 1998.

Larry Monard, Oklahoma City, for Appellant.

Robert L. Hudson, District Attorney, and Connie S. Pope, Assistant District Attorney, Guthrie, for Appellee.

## OPINION

ADAMS, Judge.

¶ 1  Robert Knight (Father) asks us to reverse a trial court order, entered pursuant to a jury verdict, which terminated his parental rights to his minor children M.K and L.K. Father alleges two constitutional violations as the basis of this appeal: (1) as a non-Indian, he was denied equal protection of the law when the triad court denied his request for a jury instruction with the same burden of proof required in termination cases involving parents of Indian children pursuant to 25 U.S.C. § 1901 *et seq.,* the Indian Child Welfare Act (the ICWA); and (2) he was denied due process when the trial court overruled his demurrer to the evidence during which he argued the State of Oklahoma (State) failed to prove that he received a copy of the service plan or that he understood the consequences of his failure to complete the service plan.

¶ 2  The undisputed facts are as follows: M.K. and L.K. were approximately 16 and 3 months old, respectively, when they were placed in the custody of the Department of Human Services (DHS) in August of 1992 because their parents' home was filthy and L.K. had failed to thrive. In October 1993, DHS attempted to reunite the family but returned the minor children to foster care after only one month because the family was homeless and the children were not receiving proper care. In late December 1993, the family was again reunited, and other than parents' voluntary placement of children temporarily with their foster parents, the family remained together until April of 1995, when DHS learned that they were again homeless and that Father had tested positive for cocaine. That same month, State, on behalf of DHS, filed a petition seeking to adjudicate M.K. and L.K. to be deprived

based primarily on Father's positive drug test.

¶ 3  At an adjudication hearing in October of 1995, Father stipulated to the allegations in State's petition and both M.K and L .K. were adjudicated to be deprived.[1]  The dispositional order with service plan was also entered at that hearing.  The plan set forth several conditions with which Father was ordered to comply.[2]  As a result of Father's failure to complete that plan, a new service plan was entered in December of 1996, and when he did not complete the second, a third plan[3] was entered in February of 1997.  Father's failure to comply with that plan led State to file its application to terminate his parental rights.

¶ 4  During Father's jury trial on December 16, 1997, State introduced evidence from a DHS social worker that since the first service plan in 1995, Father never received a drug and alcohol assessment and never completed parenting classes.  State admitted the results of 11 different urine drug screens, eight of which were positive, either for cocaine or marijuana.  Father, who was called as a witness during State's case, admitted that the court ordered him to have weekly drug screens and that out of the 112 weeks since he had been ordered to do so, he had submitted only 13.  After State rested and the children's attorney declined to introduce any evidence, Father demurred.  The trial court overruled his demurrer to the evidence,

and Father rested.  The jury returned a verdict finding that Father's rights should be terminated.  The trial court entered an order accepting that verdict, and this appeal followed.

¶ 5  In his first proposition of error, Father correctly points out that the ICWA, specifically 25 U.S.C. § 1912(f),[4] mandates a higher burden of proof for termination of parental rights as to Indian children, i.e., evidence beyond a reasonable doubt, than was applied to him.  The policy behind such Congressional mandate is provided by 25 U.S.C. § 1902:

> The Congress hereby declares that it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs.

■  ¶ 6  Father does not contend the ICWA applies to this case, but argues the trial court erred in instructing the jury that his parental rights could be terminated if proof of the statutory elements was clear and convincing,[5] instead of a jury instruction with the ICWA burden of proof as he requested.

1.  Although the file stamp indicates it was not filed until August 5, 1997, the "Amended Journal Entry of Adjudication as to Robert Knight, Father of [M.K.] and [L.K.]" was admitted into evidence at the jury trial with no objection by Father.

2.  The first service plan required, in pertinent part, that Father: (1) submit to a drug assessment; (2) submit to a drug test once a week until he tests negative for six weeks consecutively and thereafter, random drug testing every three months, (3) have weekly, DHS-supervised visitation with [L.K.]; and [L.K.]; (4) test negative three consecutive weeks before the children would be placed back in the home under the auspices of DHS; and (5) pay child support in the amount of $138.00 per month.

3.  The changes to Father's requirements under the third service plan were minimal—completion of a drug and alcohol assessment and parenting classes, a negative drug test before monthly visit

with children, and an increase in child support to $180.

4.  There is no corresponding section in the "Oklahoma Indian Child Welfare Act," 10 O.S.1991 § 40 et seq., which was adopted by our Legislature, effective April 6, 1982, with the purpose of clarifying state policies and procedures regarding the implementation of the ICWA and the policy, inter alia, to cooperate with state Indian tribes to ensure that the intent and provisions of the ICWA are enforced.  See 10 O.S.1991 § 40.1.

5.  Pursuant to 10 O.S.Supp.1995 § 7006–1.1, in order to terminate parental rights, the state must show, by clear and convincing evidence, that (a) the child is deprived; (b) such condition is caused or contributed to by acts or omissions of the parent; and, (c) termination of parental rights is in the best interests of the child.

He argues the ICWA provides Indian parents with greater protection against losing parental rights than non-Indians, and the use of the lesser burden of proof at his termination hearing violated his right to equal protection of law as guaranteed by the Fourteenth amendment of both the U.S. and Oklahoma Constitutions. Father has cited no case authority in support of this argument.

¶ 7 While it might be argued that under traditional equal protection analysis the disparate treatment provided by the ICWA requires strict scrutiny as discrimination based upon race[6], the United States Supreme Court has held otherwise. When considering the State of Montana's racial discrimination argument concerning tax immunity extended to Indians living on reservations in *Moe v. Confederated Salish & Kootenai Tribes, Etc.,* 425 U.S. 463, 480, 96 S.Ct. 1634, 1644, 48 L.Ed.2d 96 (1976), the Court stated:

> we think [that argument] is foreclosed by our recent decision in *Morton v. Mancari,* 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974). In reviewing the variety of statutes and decisions according special treatment to Indian tribes and reservations, we stated, *id.,* at 552–555, 94 S.Ct., at 2483–2485, 41 L.Ed.2d, at 302:
>
> > "Literally every piece of legislation dealing with Indian tribes and reservations ... single(s) out for special treatment a constituency of tribal Indians living on or near reservations. If these laws, derived from historical relationships and explicitly designed to help only Indians, were deemed invidious racial discrimination, an entire Title of the United States Code (25 U.S.C.) would be effectively erased and the solemn commitment of the Government toward the Indians would be jeopardized.
> >
> > \*    \*    \*    \*    \*    \*
> >
> > "On numerous occasions this Court specifically has upheld legislation that singles out Indians for particular and special treatment."

*The test to be applied to these kinds of statutory preferences,* which we said were neither "invidious" nor "racial" in character, governs here:

> "As long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians, such legislative judgments will not be disturbed." *Id.,* at 555, 94 S.Ct., at 2485, 41 L.Ed.2d, at 303. (Emphasis added).

¶ 8 Although it does not appear that the United States Supreme Court has had occasion to apply the *Mancari* test to the ICWA, at least one state court has applied the test to non-Indian adoptive parents' argument that the ICWA is unconstitutional as a denial of equal protection. In *Application of Angus,* 60 Or.App. 546, 655 P.2d 208, 213 (1982), *rev. den.* 294 Or. 569, 660 P.2d 683, *cert. den. sub nom.* 464 U.S. 830, 104 S.Ct. 107, 78 L.Ed.2d 109 (1983), the Oregon Court of Appeals, after considering that "[t]he goal of the ICWA is to protect Indian families against disruption," denied the argument, stating "[w]e hold the protection of the integrity of Indian families to be a permissible goal that is rationally tied to the fulfillment of Congress' unique guardianship obligation toward the Indians." Father has not furnished any authority suggesting otherwise and we have found none.

¶ 9 Applying the *Mancari* test as we must, we conclude the heightened burden of proof required for termination of a child covered by the ICWA is rationally tied to Congress' responsibility for policy towards Indian families. The trial court's failure to instruct the jury that the State was required to prove its case against Father beyond a reasonable doubt was not an error and did not violate Father's constitutional right to equal protection of the law.

¶ 10 Finally, Father argues that he was denied due process because State was not required to prove he was reasonably informed of or understood the service plan

---

6. We note that nothing in the ICWA prevents states like Oklahoma from requiring proof "beyond a reasonable doubt" in all termination cases. Father argues not so much that the ICWA is unconstitutional as he does that Oklahoma denies him equal protection of the laws by not requiring that burden of proof in all cases.

requirements, *i.e.*, there was no evidence establishing that he received a copy of the service plan, that he agreed to the service plan or that a hearing was held or waived dealing with the service plan. This argument is simply not supported by the record.

 ¶ 11 Unlike the case Father relies upon for his authority, *In the Matter of C.G.*, 1981 OK 131, 637 P.2d 66, wherein the record lacked *written* "judicially-prescribed norms of conduct to which the parent is expected to conform," the record in this case reflects that Father and his attorney were present in court on October 18, 1995, when the first service plan was presented and ordered by the court. Furthermore, Father signed the third service plan, ordered by the trial court on February 18, 1997, which included a statement explaining the consequences for not completing the plan, as required by 10 O.S.Supp.1996 § 7003–5.3(E).[7] More importantly, the record is replete with evidence, including Father's testimony during State's case, that he fully understood the plan requirements.

¶ 12 Father has not demonstrated any violation of his right to due process or equal protection, and where, as here, there is competent evidence reasonably tending to support the verdict of a jury, the judgment based thereon will not be disturbed on appeal. *Matter of T.R.W.*, 1985 OK 99, 722 P.2d 1197. The judgment of the trial court is affirmed.

¶ 13 AFFIRMED.

HANSEN, J., and BUETTNER, P.J., concur.

---

7. Effective November 1, 1996, 10 O.S.Supp.1996 § 7003–5.3(E) provided that an individual treatment and service plan shall include the following statement:

TO THE PARENT: THIS IS A VERY IMPORTANT DOCUMENT. ITS PURPOSE IS TO HELP YOU PROVIDE YOUR CHILD WITH A SAFE HOME WITHIN THE REASONABLE PERIOD SPECIFIED IN THE PLAN. IF YOU ARE UNWILLING OR UNABLE TO PROVIDE YOUR CHILD WITH A SAFE HOME, YOUR PARENTAL AND CUSTODIAL DUTIES AND RIGHTS MAY BE RESTRICTED OR TERMINATED OR YOUR CHILD MAY NOT BE RETURNED TO YOU.